**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| v. | : | **CRIMINAL NO. 22-CR-96 (CKK)** |
| | : | |
| **JOHNATHAN DARNEL,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, hereby, submits this memorandum in support of its sentencing recommendation for Defendant Jonathan Darnel ("Darnel").

I.    **Introduction**

Darnel is an active anti-abortion extremist, who has a history of organizing reproductive health clinic invasions around the country to prevent patients from obtaining, and providers from providing, pregnancy termination services. Darnel organized an invasion on October 22, 2020, at the Washington Surgi-clinic ("Surgi-clinic" or "clinic"), where he and his co-defendants used social media to livestream a planned "lock-and-block," during which they used force and physical obstructions to interfere with access to the clinic.   Darnel was convicted by a jury of civil rights conspiracy and Freedom of Access to Clinic Entrances (FACE) Act offenses for his role in planning and executing the clinic blockade.

To address the gravity of his federal offenses and further the goals of the criminal justice system, the government recommends that the Court sentence Darnel to a term of incarceration at the high-end of Darnel's recommended Sentencing Guidelines, which is 41-51 months at

1

combined adjusted offense level 22 and criminal history category I.

## II.     Procedural Posture

On October 14, 2022, the grand jury returned a two-count superseding indictment, charging Darnel and his co-defendants with violating 18 U.S.C. § 241 (conspiracy against rights) and 18 U.S.C. § 248(a)(1) (FACE Act).    ECF No. 113.    These charges stemmed from Darnel's scheme to obstruct access to the Surgi-clinic - a women's reproductive health clinic - located in the District of Columbia, and his participation in the blockade of that facility on October 22, 2020.    After a jury trial, on September 15, 2023, Darnel was found guilty of both charges.    *See* Minute Entry, Sept. 15, 2023.    The jury also determined that Darnel had violated the FACE Act by both force and physical obstruction.    *Id*.

## III.     Overview of the Crimes

During trial, the government presented the testimony of several witnesses and admitted approximately sixty exhibits into evidence. This evidence proved that the co-defendants collectively invaded the Washington Surgi-clinic ("Surgi-clinic" or "clinic") to block, for as long as possible, access to reproductive health care, and in doing so, injured one of the clinic's nurses and inflicted significant trauma on patients.

The evidence proved that the blockade of the clinic was planned and organized by individuals local to Washington, D.C., including co-defendants Lauren Handy ("Handy") and Jonathan Darnel ("Darnel").    Handy and Darnel advertised a call-to-action on social media, and invited participants to join the planned blockade.    *See, e.g.*, Exhibit Nos. 5066, 5082-83. Their co-defendants, along with other unindicted co-conspirators, traveled from out-of-state to participate in the October 22, 2020, Surgi-clinic blockade.

The co-defendants communicated about the planned blockade between October 7, 2020, and October 22, 2020, using social media, text messaging, phone calls, and in-person meetings. *See, e.g.*, Exhibit Nos. 3005, 4001A, 5066, 5070, 5072, 5083, 5091, 7361, 7362; 10/25/23 Trial Tr. at 158:5-12,159:3-163:2. The co-defendants communicated that the purpose of the planned Surgi-clinic blockade was to stop the clinic from providing, and patients from obtaining, reproductive health services. *Id.* In planning the blockade, Handy also scheduled a fake patient appointment at the clinic for October 22, 2020, under the name "Hazel Jenkins," to gain access to the clinic facility. *See, e.g.*, Exhibit No. 5053; 10/23/23 Trial Tr. at 83:6-11.

Handy also made lodging arrangements for the blockade participants who traveled to Washington, D.C. from other states, including co-defendants: Jay Smith ("Smith"), John Hinshaw ("Hinshaw"), and William Goodman ("Goodman") from New York; Heather Idoni ("Idoni") from Michigan; Joan Bell ("Bell") from New Jersey; and Paula "Paulette" Harlow ("Harlow") and Jean Marshall ("Marshall") from Massachusetts. *See, e.g.*, Exhibit Nos. 4001A, 5002, 5091. Additionally, Handy procured monetary donations to pay for an Airbnb lodging reservation at 133 Quincy Place NE, Washington D.C. that she made for herself and co-defendant Geraghty who traveled to Washington, D.C. from Pennsylvania on October 21, 2020, to participate in the Surgi-clinic blockade. *See, e.g.*, Exhibit Nos. 4001A, 5001, 5002, 5021, 5091.

The night before the planned clinic blockade, the ten co-defendants – led by Handy and Darnel – discussed the plan for and execution of the blockade. *See, e.g.*, 10/24/23 Trial Tr. at 22:11-23:24. At the meeting, Handy and Darnel further discussed the Surgi-clinic's layout and floor plan so that each blockade participant knew which clinic doors to blockade. *Id.*, at 25:21-24. The group further discussed using locks and chains to block the Surgi-clinic doors, and the

consequences of participating in the blockade, which included being arrested by the police and charged with criminal offenses.  *Id.*, at 25:21-24, 28:25-29:25.

On October 22, 2020, the group met again outside a coffee shop near the clinic to have one last discussion as to the planned blockade.  *See e.g.*, 10/25/23 Trial Tr. at 107:1-5 (suggesting meeting place was outside a "coffee house" or "restaurant"); *see also* Exhibit Nos. 2015, 2017. Co-defendant Joan Bell brought to this final meetup a bag containing the chains, locks, and ropes. *Id.*, at 27:23-24.   After additional discussion, the group departed for the clinic to begin successfully obstructing the clinic's operations.  *See, e.g.*, 10/24/23 Trial Tr. at 63:18-21.

The co-defendants and other unindicted co-conspirators arrived at the Surgi-clinic shortly before it was scheduled to open the morning of October 22, 2020.   While several co-defendants hid in the Surgi-clinic's fourth floor building stairwell, Handy and Bell waited outside of the clinic's patient entrance.  *See, e.g.*, 10/25/23 Trial Tr. at 122:6-11; Exhibit No. 1079A.   Handy approached "Sasha Proctor," a medical specialist working at the clinic, in the hallway outside of the clinic and falsely represented herself as "Hazel Jenkins" and stated that she had a medical appointment.    Moments later, Darnel's co-defendants who hid in the building's stairwell approached the Surgi-clinic's patient entrance.  *See, e.g.*, Exhibit Nos. 1008, 1079A.

Goodman carried the bag of chains, locks, and ropes from the stairwell and placed it on the floor just outside of the Surgi-clinic's patient entrance.   *Id.*   Bell retrieved a bicycle lock from that bag and forcefully entered the clinic.   *Id.*   Harlow picked the bag up and forcefully entered the clinic behind Bell.   Harlow wore a bicycle lock around her neck in anticipation of using it to chain herself to Bell and other co-defendants as they blocked the Surgi-clinic's doors.   *See, e.g.*, Exhibit Nos. 1016, 1079A.

Moments before the Surgi-clinic was scheduled to open at 9:00 a.m., as the co-defendants gathered outside of the Surgi-clinic's patient entrance, Darnel – who was outside of the clinic's building - announced an imminent reproductive health clinic blockade on social media and prepared to livestream the event.  *See, e.g.*, Exhibit Nos. 1017-20, 1022-1024, 1026.   Darnel used one of his Facebook accounts to create an event he titled, "No one dies today," and captioned it, "Starting soon!   Tune in!"  *See, e.g.*, Exhibit No. 3001.

At approximately 9:00 a.m., Ms. Proctor unlocked the door to admit the waiting patients with scheduled appointments.   At that time, the co-defendants (with the exception of Darnel who was outside of the building livestreaming the event) forcefully entered through the Surgi-clinic's entrance.  *See, e.g.*, Exhibit Nos. 1008, 1079A.   Co-defendant Smith, who stood at the door when it was unlocked, forcefully pushed the door open as Ms. Proctor attempted to close the door to prevent the co-defendants from entering.  *Id.*   The co-defendants collectively pushed and shoved their way in and against the clinic staff who attempted to keep the co-defendants from entering. *Id.*

As co-defendant Smith forced his way into the clinic, he pushed clinic nurse "Sara Compton" causing her to sprain her ankle and suffer bodily injury.  *See e.g.*, Exhibit No. 1001; 10/23/23 Trial. Tr. at 45:23-25. Co-defendants Marshall and Geraghty pushed and shoved against Ms. Proctor.   And, as Harlow intentionally pushed her way into the clinic, she caused "Tina Smith," the clinic's administrator, to fall backwards and into a chair.  *See, e.g.*, Exhibit No. 1008.

After forcing their way into the clinic's waiting room, the co-defendants set about physically blockading the Surgi-clinic doors.  *See e.g.*, Exhibit No. 1001.   Handy directed the blockaders on what to do.  *Id*.   Hinshaw and Marshall moved chairs in the Surgi-clinic's waiting

room to block doors that led to the clinic's treatment areas.   *Id.*   Harlow, who entered the clinic with the bag of locks, chains, and rope, worked with Smith, Hinshaw, and Bell to intentionally bind themselves together using the chains, ropes and bicycle locks, and they sat in chairs against the Surgi-clinic's interior doors.   *Id.*   Marshall assisted Harlow, Smith, Hinshaw, and Bell with using the locks and chains to bind themselves together.   *Id.*   Goodman and Idoni went into the hallway outside of the Surgi-clinic and stood in front of another clinic doorway that was used as an employee entrance.   *See, e.g.*, Exhibit Nos. 1008, 1016, 1020, 1079B.

During the blockade, "Ashley Jones," a patient at the clinic, was unable to access the treatment area because co-defendants Bell, Harlow, Smith, Hinshaw, and Marshall blocked the clinic's doors.   *See, e.g.*, Exhibit Nos. 1008, 1016.   Ms. Jones was forced to climb onto a chair and through a receptionist window in the waiting room to access the Surgi-clinic's treatment area, which was where the clinic staff remained during the co-defendants' blockade.   *Id.*

A second patient, "Shampy Holler," was also unable to access the clinic's treatment area because of the co-defendants' blockade.   *See, e.g.*, 9/12/23 Trial. Tr. at 14:22-25.   Mrs. Holler, who was experiencing labor pains and in need of immediate medical attention, was forced to lay on the hallway floor outside of the clinic because the co-defendants refused to allow her and her husband to enter.   *Id.*, at 15:1-2.   At one point as Mrs. Holler lay on the ground, she was accosted by Marshall.   *See, e.g.*, Exhibit No. 1079B.   As Mrs. Holler attempted to get up from the floor, Marshall pushed Mrs. Holler back down to the floor in order to prevent her from entering into the facility.   *Id.*; *see also* 9/12/23 Trial. Tr. at 21:7-9.   After a short time, the clinic staff managed to open the staff entrance briefly and were able to get Mrs. Holler into the clinic.   *Id.*, at 21:16-19.

Throughout the entire blockade, Darnel livestreamed the event on social media.   *See, e.g.*,

Exhibit Nos. 1017-1019, 1022-1024, 1026.   Additionally, he assisted his co-defendants in prolonging the blockade by secreting the keys to the bicycle locks used to bind several blockading co-defendants together to an unindicted co-conspirator who was outside of the clinic building. *See* Exhibit No. 1024.   Darnel did this in order to delay the blockading co-defendants' inevitable arrests by responding Metropolitan Police Department ("MPD") officers.

The co-defendants remained within the Surgi-Clinic's waiting room for several hours blocking the doors in an effort to interfere with the provision of abortion services.   They refused to move or leave the clinic when asked by the clinic's staff and responding police officers.   *See, e.g.*, Exhibit No. 1016.   The co-defendants were very vocal about their blockade, and their reasons for preventing access to the Surgi-clinic.   For example, Handy explained to the first responding MPD officers, "[the co-defendants] were doing a rescue . . . . On the fourth floor is an abortion facility and so today [the co-defendants] are blocking it . . . to not allow people to go inside . . . . [t]o stop abortions today."   *See* Exhibit No. 1009.   Similarly, while sitting in a chair blocking access to the clinic's treatment area, Harlow explained to one MPD officer, "We can't move. We have permanent locks."   *Id*.   Harlow then further lectured that same officer, telling him that he "ha[s] a conscience" that should lead him to "let [the co-conspirators] stay" in the clinic to "save lives."   *See* Exhibit No. 1137.

After refusing the requests to move or leave the Surgi-clinic, the co-defendants were advised that they would be arrested.   With the exception of Darnel and Geraghty – who left the clinic moments before arrests were made, the remaining co-defendants were arrested.   They passively resisted arrest by going limp, including when the police cut the bicycle locks that Bell and Harlow wore around their necks and placed them under arrest.   *See, e.g.*, Exhibit No. 1016.

The arrested co-defendants were carried out of the building and into transport vehicles.

In short, the testimony and exhibits presented proved that the co-defendants refused to move or leave the clinic because it was their intention to interfere with the Surgi-clinic's patients from obtaining, and the clinic staff from providing, pregnancy termination services. The co-defendants' participation in the planned blockade interfered with Ms. Jones, Mrs. Holler, and other patients from accessing the Surgi-clinic, and further interfered with the clinic staff's ability to provide reproductive health services.

## IV.    Darnel's Criminal Conduct

The evidence at trial proved that the clinic blockade was the product of Darnel and Handy's vision to make "history" by organizing the first "lock-and-block rescue" in 25 years. *See* Exhibit No. 1017. They were the masterminds who chose the clinic, advertised the event, recruited participants, and planned the crime.[1] As discussed above, Darnel communicated extensively with Handy about the clinic invasion, as early as October 1, 2020, or three weeks before the blockade. *See* Exhibit No. 5083.

The evidence at trial established Darnel's role in the charged offenses as an organizer and leader. Darnel actively advertised the blockade using social media by posting in various Facebook groups, organizing zoom calls, and asking "those of you who cannot attend" to share a livestream of the "important event[.]" *See* Exhibit No. 5066. Darnel also collaborated with Handy to promote the blockade, providing feedback to her social media posts and encouraging her to include the words "civil disobedience" because "the idea of deliberately breaking the law is sexy." *See* Exhibit

---

[1]    Rule 404(b) evidence admitted at trial further established that Darnel and Handy blockaded a reproductive health clinic in Silver Spring, Maryland, on January 30, 2021; and in Alexandria, Virginia, on November 16, 2021.

No. 5083.   Darnel actively recruited participants to join the blockade, describing the blockade as a "big event." *See* Exhibit No. 5070.

The night before the blockade, the co-Defendants and their co-conspirators convened a meeting to discuss the plan.   The meeting was led by Handy and Darnel, who co-conspirator and cooperating government witness Davis testified was giving "leadership vibes." *See* 9/12/23 Darnel Trial. Trans. at 54:23-23. Davis further described how Darnel passed around a paper for the volunteers to write down their contact information in anticipation of being arrested, *id.* at 55:4-9. Darnel was planning for and aware of the repercussions of the blockade well in advance.

On the day of the blockade, Darnel continued his role as an organizer and leader. Darnel publicized the blockade as his co-defendants invaded the clinic, advertising that the blockade was "Starting soon!" and telling everyone to "Tune in!" and posting updates, including one indicating that police were arresting and removing his co-defendants. *See* Exhibit Nos. 3001-03. Darnel also livestreamed the entire blockade, telling the world that "people were intervening physically with their bodies to prevent women from entering the clinic[.]" *See* Exhibit No. 1017. When police arrived on scene "earlier than expected," Darnel expressed disappointment, telling the viewers, "We may have to go to a different abortion clinic next time." *See* Exhibit No. 1024. Darnel was further responsible for taking the keys to the chains, which were locked around Harlow and Bell, and hiding them from law enforcement, which further hindered law enforcement's ability to remove Harlow and Bell from the clinic's waiting room. *See* Exhibit No. 1023.

Notably, despite filming his co-defendants arrests and witnessing the distress he was causing the clinic's patients and staff, Darnel was not deterred. When he was not arrested along with his co-defendants at the Surgi-clinic, Darnel went to a different reproductive health clinic in

Washington, D.C. and was arrested at that clinic after refusing to leave, seeking out the arrest he had avoided earlier in the day. *See* Attachment A (photo of Darnel being arrested later in the day on October 22, 2020).

## VI.   Statutory Penalties

The two counts, for which Darnel and his co-defendants were convicted, carry the following statutory penalties:

Count 1:   Conspiracy against Rights, in violation of 18 U.S.C. § 241, carries a maximum sentence of 10 years' incarceration;

Count 2:   Clinic Access Obstruction, in violation of 18 U.S.C. § 248(a)(1) & (b), carries a maximum sentence of 12 month's incarceration.

## VII.   Sentencing Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 45 (2007); *Rosales-Mireles v. United States*, 585 U.S. 129, 133 (2018) ("[D]istrict courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process.") (internal quotations and citations omitted). "[T]he Guidelines remain the foundation of federal sentencing decisions. *Hughes v. United States*, 584 U.S. 675, 685 (2018). "As a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id.* at 46.

The government agrees with the Sentencing Guidelines calculation set forth in the Presentence Investigation Report ("PSR"). ECF No. 514.   Darnel's Base Offense Level for both

of his counts of conviction is 12.  PSR at 12-14.  And his Base Offense Level is adjusted as

follows:

| Guideline | Description | Adjustments |
|-----------|-------------|-------------|
| § 2H1.1(a)(2) | Where the offense involved two or more participants | 12 |
| § 3A1.1(b)(1) | Vulnerable victim[2] | 2 |
| § 3A1.3 | Restraint of victim[3] | 2 |
| § 3B1.1(a) | Aggravating role adjustment applicable to Darnel for being an organizer or leader of a criminal activity that involved five or more participants | 4 |
| § 3D1.4 | Combined offense level for two equally serious groups | 2 |
| **Combined Adjusted Offense Level** | | **22** |

*See id*.  Darnel falls under Criminal History Category I. *See* PSR at 15-16. Accordingly, Darnel's

Guidelines sentencing range is 41-51 months.

## VIII.   Section 3553(a) Sentencing Factors

The Court should next consider the sentencing factors set forth in 18 U.S.C. § 3553(a).

*Gall*, 552 U.S. at 49-50.  That Section provides that Court consider the following:  (A) "the

nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1); (B) "the history and

---

[2]      This adjustment is applicable because Ms. Jones and Ms. Holler were pregnant and unusually vulnerable due to their physical condition.  *See, e.g.*, *United States v. James*, 139 F.3d 709, 714-15 (9th Cir. 1998) (Affirming the trial court's application of the vulnerable victim adjustment where the defendant threatened a pregnant bank teller during the commission of a bank robbery).

[3]      "Physically restrained" means the forcible restraint of the victim *such as* being tied, bound, or locked up.  U.S.S.G. §1B1.1 (Application note 1(K)) (emphasis added).  The use in the definition of "such as" indicates that the terms are merely illustrative examples and do not limit the type of conduct that may constitute a physical restraint.  *Arcoren v. United States*, 929 F.2d 1235, 1246 (8th Cir. 1991) (Restraint of victim adjustment applied in case where the victims were pushed into a room and prevented from leaving); *see also United States v. Stokley*, 881 F.2d 114, 116 (4th Cir. 1989) (same).

characteristics of the defendant," *id*.; (C) promotion of "respect for the law," 18 U.S.C. §
3553(a)(2)(A); (D) general and specific "deterrence," 18 U.S.C. § 3553(a)(2)(B)(C); (E) the
Guidelines and Guideline range, § 3553(a)(4); and (F) "the need to avoid unwarranted sentence
disparities among defendants with similar records who have been found guilty of similar conduct."
§ 3553(a)(6).

A.    *Nature and Circumstances of the Offenses*

The first factor this Court should consider is the nature and circumstances of the offense;
both support a significant sentence for Darnel.   Darnel orchestrated a reproductive health clinic
blockade involving numerous participants with the goal to prevent patients from obtaining, and
providers from providing, abortion services.

Among other things, Darnel and his co-leader, Handy, used social media to advertise the
planned blockade. In addition to using his own social media platform to recruit participants, Darnel
helped Handy craft her own advertisements, suggesting language to make their actions seem
"sexy."   And Darnel planned from the very beginning to livestream the event to the world.   As a
result of Darnel's advertising, recruiting, and planning, the co-conspirators were determined to
invade the clinic—even if meant using force, which resulted in one clinic staff member suffering
bodily injury and prevented Mrs. Holler, who was suffering from labor pains, from getting up off
the floor and entering the clinic.   The physical obstruction was especially traumatic for the clinic
patients who testified at trial, which was apparent during the offense and their emotional trial
testimony.   *See*, *e.g*., USA Ex. No. 1011.

A prison sentence at the high-end of the Guidelines range would account for the seriousness
of Darnel's offenses.   His strongly held anti-abortion beliefs led him to devise a plan to block

access to the Surgi-clinic and to ensure its success.   The blockade, which Darnel broadcast publicly, encouraged others to commit similar crimes, publicized his own offense, and traumatized the victims.   The blockade will have lasting impacts on Ms. Jones, Mrs. Holler, and the clinic staff, which they will likely struggle with life-long. For this reason, this factor supports a significant sentence.

        *B.*     *The History and Characteristics of the Defendant*

Darnel's history and characteristics support the imposition of a Guidelines sentence. Darnel's personal history of participating in clinic invasions after the charged offenses further warrant imposition of a Guidelines sentence.   In at least two other incidents that this Court learned about at trial through admission of Rule 404(b) evidence, Darnel and some of his co-defendants similarly blockaded reproductive health clinics in Silver Spring, Maryland, and Alexandria, Virginia, in the months following the D.C. invasion.

Darnel's conduct in the instant offenses was not an isolated incident, and his individual history and personal characteristics warrant a high-end Guidelines range prison sentence.

        *C.*     *Promotion of Respect for the Law*

Considering the gravity of the offenses, a significant sentence in this matter is necessary to promote respect for the law.   *See Gall*, 552 U.S. at 54 (recognizing that "a lenient sentence for a serious offense threatens to promote disrespect for the law").   A Guidelines sentence is appropriate in this case because Darnel demonstrated a blatant disregard for the law when she planned with others to "injure, oppress, threaten, and intimidate" the clinic's patients and providers from exercising their reproductive health rights free from violence and obstruction.   *See* Superseding Indictment, ECF No. 113.   As established at trial, Darnel understood that she had

planned a crime, and that it was a violation of the FACE Act.   Darnel and his co-defendants were prepared to be arrested knowing the consequences of their actions.   The clinic blockade that Darnel orchestrated involved the use of force, which resulted in Ms. Compton suffering bodily injury and prevented Mrs. Holler, who was suffering labor pains, from getting up off the floor and entering the clinic.   The physical obstruction was especially traumatic for the clinic patients who testified at trial, which was apparent during the offense and their emotional trial testimony.   *See*, *e.g.*, USA Ex. No. 1011.

A high-end Guidelines sentence would promote respect for the law.   Darnel faced a clear choice: to plan and engage in forceful and obstructive conduct or plan and engage in lawful protest, as others did that day.   Darnel chose the former and helped ensure the success of co-conspirators' forceful take-over of the clinic that obstructed access to the facility.   The trial evidence proved that Darnel understood he was committing a crime by blockading the clinic, and that despite knowing the consequences of his actions, chose to violate federal law.   Darnel faced other choices in the aftermath of the Surgi-clinic blockade: to orchestrate other clinic blockades or engage in lawful protest.   Again, the evidence at trial showed that Darnel continued to blockade facilities in other jurisdictions, knowing his conduct violated federal law.   It did not matter to Darnel that he was committing crimes, because he has never suffered any serious consequences for his criminal activity.   All of Darnel's choices point to the obvious need for a high-end Guidelines prison sentence that will promote respect for the law.

D.    *General and Specific Deterrence*

Imposition of a significant sentence is necessary to provide for both general and specific deterrence.   "Under the theory of general deterrence, the government essentially seeks to make an

14

example of an offender through punishing him so that other potential offenders are intimidated into refraining from committing the contemplated crime." *United States v. Slatten*, 865 F.3d 767, 819 (D.C. Cir. 2017) (noting that "harsh sentences" "generally operate as strong deterrents"); *United States v. Diaz-Navarro*, 567 F. App'x 256, 257 (5th Cir. 2014) (since defendant had committed offense before and received a light sentence a "'long incarceration period'" was necessary for deterrence); *United States v. Rivera*, 488 F. App'x 225, 227 (9th Cir. 2012) (harsh sentence necessary for deterrence in light of defendant's recidivism).

First, a significant sentence is necessary "to afford adequate deterrence to criminal conduct" by others.  18 U.S.C. 3553(a)(2)(B).  Sentencing Darnel to a period of incarceration would deter other abortion extremists (whether pro-life or pro-choice) from obstructing access to reproductive health services.

Second, a significant sentence is also necessary for specific deterrence.  In light of Darnel's strongly held beliefs, and history of organizing and participating in clinic invasions both before and after the charged offenses in this case, a prison sentence will deter him from engaging in future violations of federal law.

Without imposition of a significant Guidelines sentence here, Darnel and other would-be violators will not be discouraged from engaging in misconduct and may believe that there are relatively minimal consequences for flagrantly committing crimes that target the provision of reproductive health care.

E.    *The Sentencing Guidelines*

Examination of the Section 3553(a) factors shows that a high-end Guidelines sentence is appropriate in this case.  While a "sentencing court does not enjoy the benefit of a legal

presumption that the Guidelines sentence should apply," *Rita v. United States*, 551 U.S. 338,

351(2007), and it "may not presume that the Guidelines range is reasonable," *Gall*, 552 U.S. at 50;

*Nelson v. United States*, 555 U.S. 350, 350 (2009), "even in an advisory capacity the Guidelines

serve as 'a meaningful benchmark' in the initial determination of a sentence and 'through the

process of appellate review.'"   *Rosales-Mireles*, 585 U.S. at 133.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens

of thousands of sentences and worked with the help of many others in the law enforcement

community over a long period of time in an effort to fulfill [its] statutory mandate."   *Rita*, 551

U.S. at 349.   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past

practice in the interests of greater rationality, avoiding inconsistency, complying with

congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007);

28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to 'base its

determinations on empirical data and national experience, guided by professional staff with

appropriate expertise,'" and "to formulate and constantly refine national sentencing standards."

*Kimbrough*, 552 U.S. at 108.   As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing
> Commission's in-depth research into prior sentences, presentence investigations,
> probation and parole office statistics, and other data. U.S.S.G. § 1A1.1, intro,
> comment 3.   More importantly, the Guidelines reflect Congress's determination of
> potential punishments, as set forth in statutes, and Congress's on-going approval of
> Guidelines sentencing, through oversight of the Guidelines revision process.   *See*
> 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the
> Guidelines).   Because the Guidelines reflect the collected wisdom of various
> institutions, they deserve careful consideration in each case.   Because they have
> been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).

In light of Darnel's conduct in this case, a high-end Guidelines sentence would be reasonable and appropriate for both counts of conviction. At the high-end, Darnel's sentence, which in this case would be 51-months, accounts for 38.5% of the maximum allowable sentence for his counts of conviction (Count One statutory maximum sentence of 10 years; Count Two statutory maximum sentence of 12 months). Such a sentence would be reasonable because it accounts for his conduct in D.C., as well as continued disregard for law in other clinic blockades as established at trial. And, it would be sufficient, but not greater than necessary, to comply with the basic aims of Section 3553(a). *Rita*, 551 U.S. at 348.

F.    *Unwarranted Sentencing Disparities*

This Court should impose a Guidelines sentence to avoid any unwarranted sentencing disparity. 18 U.S.C. § 3553(a)(6); *see, e.g.*, *Molina-Martinez v. United States*, 578 U.S. 189, 193 (2016) ("Uniformity and proportionality in sentencing are achieved, in part, by the Guidelines' significant role in sentencing"); *United States v. Alford*, 89 F.4th 943, 953 (D.C. Cir. 2024) ("Thus, '[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly.'"); *United States v. Otunyo*, 63 F.4th 948, 960 (D.C. Cir. 2024) (same).

Although Darnel and his co-defendants in this case, along with defendants from one other recently charged unrelated case from the Middle District of Tennessee (*see United States v. Gallagher*, et al., 22-cr-327 (M.D.TN)), will be the first groups of defendants sentenced for conspiring to violate reproductive health rights, they all are similarly situated to other Section 241 convicted defendants who received Guidelines sentences where the objects of their civil rights conspiracy targeted other federally protected rights. *See*, *e.g.*, *United States v. Liddy*, 542 F.2d

76, 78 (D.C. Cir. 1976) (Defendant convicted of violating Section 241 (Fourth Amendment right at issue) sentenced to a term of imprisonment from one to three years); *United States v. Stewart*, 65 F.3d 918, 931-32 (11th Cir. 1995) (Court imposition of a Guidelines sentence in a Section 241 prosecution affirmed (42 U.S.C. § 3631 housing rights at issue)); *United States v. Whitney*, 229 F.3d 1296, 1309 (10th Cir. 2000) (same); *United States v. Allen*, 341 F.3d 870, 897 (9th Cir. 2003) (affirming Guidelines sentence for Section 241 conviction with right at issue was denial of public accommodations because of race); *United States v. McCoy*, 480 F.App'x 366, 373 (6th Cir. 2012) (Guidelines and statutory maximum sentence imposition affirmed for convictions of Sections 241 and 242).   Therefore, a Guidelines sentence for Darnel would not result in any sentencing disparities.

The government also strongly opposes any requested variance from the Sentencing Guidelines.   Darnel's conduct showed a flagrant disregard for women's reproductive health rights, and the lack of concern for Ms. Jones and Mrs. Holler who, for example, sought care during a particularly sensitive time in their lives.   Combined with the other sentencing factors, a high-end Guidelines sentence would serve all of the Section 3553(a) factors.

## IX.   Requested Sentence

The government recommends that the Court impose a sentence at the high-end of Darnel's Guidelines Sentencing range, which is 41-51 months.   The advisory Guidelines Sentencing range should be given considerable weight.   First, the Guidelines range is itself a § 3553(a) factor. "The fact that § 3553(a)[(4)] explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."   *Gall*, 552 U.S. at 50, n.6.   Second, one

of the Sentencing Commission's purposes in promulgating the Guidelines was to "assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2)."   28 U.S.C. §§ 991(b)(1)(A), 994(f).   The Commission wrote the Guidelines to "carry out these same § 3553(a) objectives," resulting in "a set of Guidelines that seek to embody the § 3553(a) considerations, both in principle and in practice." *Rita*, 551 U.S. 338, 350.   "[W]here judge and Commission both determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that ☐significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347.   In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.[4]

Darnel planned, advertised, recruited, and did everything he could to ensure the clinic blockade prevent access to vital reproductive healthcare.   Despite multiple arrests for the same conduct, Darnel has not been deterred from violating federal laws.   Darnel not only capitalized on his victimization of vulnerable victims, but he also promoted and publicized his crimes. Here, a sentence at the high-end of the Guidelines will achieve a sentence that reflects the Sec. 3553 factors.   In particular, such a sentence reflects the gravity of the offense (to include vindicating

---

[4]      The government respectfully disagrees with Probation's recommendation for a downward variance.   ECF No. 520.   Their recommendation is based on the following: (1) the nature of the circumstances of the offense, and (2) to avoid unwarranted sentence disparities.   *Id.* at 3.   As set forth above, the government believes that the nature and circumstances of the offenses – attempting to deny the receipt of reproductive health care and intentionally inflicting physical and mental pain on patients – merits a Guidelines sentence; and, as the D.C. Circuit has held, imposing a Guidelines sentence is the best way to avoid unwarranted sentencing disparities.

the rights of those whom Darnel victimized), the need for deterrence, and the absence of any mitigating factors.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052
*/s/ Rebecca G. Ross*
REBECCA G. ROSS
NY Bar No. 5590666
JOHN CRABB JR.
NY Bar No. 2367670
Assistant United States Attorneys
601 D Street, NW
Washington, DC 20001
john.d.crabb@usdoj.gov

KRISTEN CLARKE
ASSISTANT ATTORNEY GENERAL
CIVIL RIGHTS DIVISION
*/s/ Sanjay H. Patel*
SANJAY H. PATEL
IL Bar. No. 6272840
Trial Attorney
Criminal Section, Civil Rights Division
Email: Sanjay.Patel@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of this memorandum has been filed and served upon all parties listed on the Electronic Case Filing (ECF) System and is available for viewing and downloading from the ECF system.


*/s/ Rebecca G. Ross*
REBECCA G. ROSS
Assistant United States Attorney